For the appellate Mr. Dempsey, for the appellee Ms. Martinkus, you may proceed. May it please the court and counsel, this case stems from a custody judgment entered in the Supreme Court of Champaign County on July 13, 2015 after a rather lengthy custody hearing before the trial court. And really, perhaps the primary issue and the issue the trial court relied upon most was allegations of sexual abuse by the petitioner against the minor child in this case. That was the sole determining factor in the court's custody decision and the court had the assistance of a home and background investigation prepared by Dr. Helen Appleton in which she concluded that the minor child had not been sexually abused by the petitioner. In fact, that these allegations were the result of a shared delusion between the minor child and the petitioner. That's the key premise that the trial court relied upon in granting custody to the petitioner. It's our position the trial court erred in denying certain evidence, denying certain exhibits during the course of the trial and the cumulative effect of those denials of that evidence constitutes reversible error. And specifically, the petitioner's response exhibits 1, 2, and 15 were all journal entries that were made by the petitioner at some point in his life when he was younger, but they all related to either deviant sexual thoughts or sexual thoughts relating to young people, teenagers or children. And the court excluded... Counsel, let me stop you there. Your mention of those exhibits brings me to the motion that you filed to supplement the record, the motion you filed today regarding those exhibits. Correct. Did you have anything to say on that motion? Correct. What I would say, Your Honor, is that once I got the appellate record, I made an initial request to the Champaign County Circle Clerk to search for those exhibits. They initially told me that no... So you're talking about when you received... You didn't make the request for the record until, what, about 24 days after you filed your notice of appeal? I believe that may have been correct, Your Honor. So that's the point that you began looking for them? No, not until I actually received the appellate record from this court that I attempted to... From this court? From this court, correct. And when was that? That would have been, I believe it was in mid-December of 2015. And so you realized when that they weren't in the record? Once we began the preparation of the brief that I realized that those exhibits were not in the appellate record. So I made an initial request of the Champaign County Circle Clerk at that point to try to locate the exhibits. They told me they searched and they could not find those exhibits at that point. So I'd received, knowing that this was going to be an issue, I made another request of the Champaign County Circle Clerk to attempt to locate those exhibits. And they were able to locate those exhibits at this point. So I'm not sure what changed between the first time I asked the Champaign County Circle Clerk to search those exhibits and the second. But in addition to asking the Circle Clerk, I asked the court security officers to search their evidence lockers to see if they could find those exhibits. But for whatever reason, those exhibits were cataloged and made part of the record. And in my motion, I've attached a citation to the appellate record where the Champaign County Circle Clerk acknowledges receipt of those exhibits. They did include response exhibit number 15, though, in the appellate record. So 1 and 2, but not 15, is what part of this motion is for. 15, which is one of those journal entries, was made a part of the record. So apparently those records were stored, those exhibits were stored together. I'm not sure how response exhibit 15 made it into the record, but 1 and 2 and 20. When did you file your notice of appeal? In November 4, 2015. Did you check the record then to make sure it was going to be complete? I did not check the record because I did not have access to the Champaign County Circle Clerk's evidence locker at that point. Well, it's part of the appellate to provide a complete record for the appellate court. The Circle Clerk's office, at best, really only has a vague idea. Isn't it your obligation to check and see what they gather from the trial court proceeding to make sure it comes up to this court? It is. Until I got the record, though, I had no reason to believe those would not be included in that. So it looks like from the chain of custody that the court security officer, who initially was present for part of the custody hearing, took possession of the exhibits at that point. They logged them in, cataloged them, and at some point they got transmitted to the Champaign County Circle Clerk. So when that time frame was, as far as I know... So your sense is that you file a notice of appeal and all this is supposed to happen automatically without any scrutiny or supervision by the appellant's lawyer? Well, I don't know how I would be able to get access to look at exhibits... How about go to the clerk's office and say, I filed a notice of appeal and I want to make sure all the exhibits before the trial court are sent up. I'd like to go over them with you. That certainly would have been an option. I guess I've never had an issue with the Circle Clerk losing exhibits in the past. I had no reason to believe that they would not have kept all the exhibits that were introduced or denied in admission at the hearing. Well, counsel, I'm still a little confused. Of course, we've had other cases that we've been dealing with today. So to receive your motion regarding these exhibits today, which, by the way, aren't here. They're still not here, according to our clerk. I'm still confused because you say that you checked the record and realized it. Well, as you are aware, you filed a motion for leave to file your reply brief late. You filed that motion after your reply brief was already due. And then we had difficulty getting the record back from your office. You sent the reply brief after being granted a brief extension. We asked you to email that as well. And then you took several days after sending your reply brief to forward the record. So are you saying that at one point you noticed it was missing and then you checked with the clerk and they assured you it was there and then you found out it wasn't there again? Because I still don't understand why this is being filed today, given you have filed your brief, your reply brief. You've sent the record back. I don't understand why this is just being filed today. Well, Your Honor, it was – I certainly believed that those exhibits were not going to be located. Because I had made an attempt, once I initially got the record from the appellate court, to try to locate those exhibits. And I had gone and talked to the circuit clerk. They went down to the basement, apparently, where the exhibits are stored. And they told me they looked again and that those exhibits could not be found. So I went ahead and prepared the brief, filed it, attached copies of the exhibits that were denied at the hearing on the issue of custody. And I simply decided to make another attempt to try to locate the exhibits. I went back, talked to them again. This time they were able to locate the exhibits. And so when I talked to the circuit clerk and they notified me they had found the exhibits, the clerk that's in charge of appeals indicated that she would attach them to, I guess, the blue back is what she called it, and transmit them to the appellate court. Apparently, they haven't done that, but those exhibits were located. And it wasn't until I made the second attempt and talked to them again, after they had been told the first time that those exhibits could not be located, that they now told me the exhibits were located. Well, really this gets me to an overarching problem that I have with this case. And I don't know what your circumstances are, but I'm very concerned about the lack of compliance with Rule 311. This is a serious matter. We take the deadlines and the rules that the Supreme Court has put in place very seriously. And given the multiple requests for extensions, the failure to do things on time on your part, you've put us in a situation where it's impossible for us to issue a decision in accordance with the mandates of Rule 311. And I just don't understand what happened here. I think a large part of the issue was the amount of time it took for the court courts in Champaign County to prepare the transcripts of the hearing. We had a week-long trial, plus we had transcripts of prior proceedings that the court took judicial notice of at the hearing on the issue of permanent custody. And I don't think I received those transcripts until approximately less than a week before my initial brief was due. Okay, but counsel, you didn't even ask for the record to be prepared until three weeks after you filed your notice of appeal. And Rule 311 talks about the reporters being required to make this a priority and maybe being taken off other work so that they can do this. So, I mean, what steps did you take? Did you talk to the trial court with counsel to make sure that this was being done in an orderly fashion to make sure? I mean, I'm sure you want the best result for your client. I'm sure you want a decision in this important case in a timely fashion. Correct. I filed the notice of appeal, sent it to the trial court judge, sent it to the presiding judge that was required by the rule to notify that this was a child custody case that was now up on appeal. So, I don't know what transpired between the trial court and the court courts in Champaign County, but that's how long it took them to prepare the transcript of this rather lengthy proceeding. And so I didn't get the transcripts, which I think were about 1,800 pages, until I think it was less than a week before my initial brief was due. And it was simply impossible at that point to be able to provide this court with an adequate recitation of the facts from the transcripts when I get a vast number of transcripts within days of the date that my initial brief was due in this case. When was your initial brief due? I believe it was due in, I think it was in mid-January, I believe. And so, how much time did you give this court with the record in terms of when you returned the record to this court? I believe we sent it UPS. Our brief was, I think I mailed it on Friday, I believe the next Monday after we sent off the reply briefs, we UPSed the record back here to the court. What date was that? It was this month, right? Or the end of March? It was March 8th when I mailed off the reply brief, so I believe it was March 11th that I believe we UPSed it back here in two volumes. And part of the delay with getting the reply brief filed was that, again, there was 10 volumes of supplemental record that were the transcripts that were requested from the Champaign County Court of Reports. So when the Petitioner's Council filed their brief, those volumes got mailed back here to the clerk of the Appellate Court. I requested the record at that point so I could prepare the reply brief. I was told that those transcripts were not part of the record, and there had to be a motion filed to be able to supplement the record, to be able to make those part of the record, so that I could even get those 10 transcripts, which constitute the vast majority of the evidence at the hearing on custody, so that I could prepare the reply brief. And so that's what resulted in the motion for extension of time to file the reply brief. And why weren't you aware of that? I don't understand why the clerk would have to advise you of that. Well, I knew that I had to file it. I assumed that I would get the appellate record, including all of the transcripts of the hearing on permanent custody, from Petitioner's Council. Instead, they were mailed back here, and then I had to request them from the clerk of this court. They wouldn't give them to me until the motion to supplement the record was filed at that point. And did they have to make multiple requests of you to file that motion? More than one? They made a couple, I think, yes. But in a sense, the issue of whether or not the respondent in this case sexually abused this minor child was perhaps the key issue in this case. And it's our position that the trial court's refusal to allow these exhibits and other testimony to evidence at the hearing on the issue of custody constitutes a reversible error, just based on the amount of evidence that's excluded by this court. And the trial court basically held that the prejudicial effect of these statements by the respondent outweighed the probative value. But again, it was our position that the respondent in this case sexually abused a young child. And these were statements that were made by the respondent, where he's talking about wanting to have sex with his 16-year-old cousin. He says, I must be depraved. Oh, whoa. And that's in response exhibit number one. He talks about using a crimping iron and shoving up his ex-girlfriend's vagina in response exhibit number two. And other things in response exhibit number 15. Counsel, what was the age of these various diary entries? I think the respondent testified that he was... Not his age. How old were the entries? How old were the entries? I think they were probably about 20 years old at the time. And there was no evidence that he had actually shoved a crimping iron up anyone's vagina. Is that correct? Correct. But... Was there also evidence that one of the entries was actually an excerpt from a poem or a song? I can't recall which it was, but of some artist that he was interested in at the time he wrote these entries. Correct. That's response exhibit number 15. But if you look at what he wrote after that, he says, the above line where he's talking about bittersweet is the concept of a 13-year-old. And unfortunate but profound truism is now something of a classic in these parts as I propagate it accordingly. So he's not just reciting that, he's agreeing with that statement. And how old was he at the time? I believe, again, he was either a late teenager or in his early 20s. And what was his age at the time of the trial in this case? He was in his early 40s at the time. But, Your Honor, if a person is a pedophile, they're a pedophile for an extended period of time. It's not something where you can just decide that I'm going to stop being a pedophile and stop having interest in young children. And there was considerable evidence... So it's your position that you established that he was a pedophile? Correct. I mean, if you look at his own writings, there's one exhibit where he talks about, where he admits, it's an email to my client where he admits that he kissed his daughter in a sensual way. And the respondent testified about that incident where he observed him kissing their daughter in a sensual way. There's another email, which is response exhibit number 32, where the respondent summarizes a conversation that she had with the respondent in March of 2010 where the petitioner told the respondent, I'm at risk for inappropriate sexualization of my students and my colleagues and Sophie, the minor child, in this case. To say that this case was very difficult, I mean, we had testimony by the petitioner that he was forced to admit things in an effort to reconcile and to save the relationship. So certainly, Judge Blockman had to make some credibility determinations, and those are resolved against your client. Would that be a fair statement? On that issue, I don't think so. I think the theory in his theory was that these were all issues that he had in the past, and despite admitting that he lied about a lot of things in those, he claims he lied about being bipolar, about having borderline personality disorder. He lied about all of those. His position was that, well, I suddenly discovered I didn't have any of these conditions, and that even though I went to a sexual addiction treatment class for a period of time, I never had that condition. But didn't he say that it wasn't a sexual addiction treatment class? She said it was, and he said it wasn't. Correct, but I think there's emails in there where he's talking about getting treatment for his sexual addiction as well. So we had a complete lack of any written evidence whatsoever in which he claimed, that was his theory at the time, that, oh, I was forced to write these things back then if I wanted to have access to my daughter, if I wanted to see my daughter. There's absolutely nothing in writing whatsoever that indicated that was the case. There's nothing to suggest that these writings from the petitioner were anything other than his own true thoughts at the time. I guess my point is this. How are we, on this cold record, to make a better determination as to who's telling the truth as to what really happened than Judge Blockman, who saw and heard from these witnesses? How are we supposed to do that? Well, I think that's one issue on whether or not this Court believes that Judge Blockman's ruling was against the manifest way of the evidence. But that has no bearing on whether or not the cumulative effect of not allowing all this relevant evidence, How is it relevant that a 17-year-old admits in writing that he fantasizes about his 16-year-old cousin? Well, Dr. Appleton, and even A.K. Wooten, and Crossley. No, I don't ask about Dice. I'm asking you. Argue the relevance to me. All three of us have been trial judges. If a person has an interest in sexual children, or a sexual interest in children, that's not a child if he's 17 and she's 16. Right, but there was also testimony that Judge Blockman did not allow, about a conversation my client had with a respondent in March of the winter of 2010, where he tells my client that when he was younger, he sexually abused his sister when his sister was a child. Judge Blockman didn't allow that in either. By going out in the woods and forcing her to hit him on the buttocks with a leaf or something like that, that's what you're referring to? Correct. I think then he went on to talk about that he actually sexually abused his sister as well, I believe. But that's the cumulative effect. We're already talking about this sexual abuse. The allegations between August of 2014 and January of 2015, when he decides he's going to stop having any contact or visitation with his daughter whatsoever, there's multiple allegations of sexual abuse. So that's one aspect that's already in the case. We have his own writings where he talks about having sexual addiction, about sexualizing his daughter, about inappropriately and sensually kissing his daughter. So that's already out there. And for Judge Blockman to say that the prejudicial effect of these exhibits somehow outweighs its probative value, when his claim is, oh, suddenly I just was cured of all these issues. I no longer had sexual addiction. I was no longer at risk of sexualizing my daughter. All of a sudden I'm just cured of that. That clearly defeats that argument because these are longstanding issues. And if we're just limiting it to this period of time between 2010 and 2011, that's one issue. But if these are issues that go back to his teenage years and he's suffered from that since then, he can't come into court and say I was just suddenly cured of these issues without counseling, without any sort of treatment. We'll hear from you on rebuttal. Good afternoon, judges, counsel, and please the court. Really what counsel talked about really was the admission of these exhibits and really not the crux of this case because I believe that even if these exhibits had been admitted, they would not have changed the decision of Judge Blockman in this case. And I think the judge was correct. I'm sure this court reviewed his ruling in this case when he indicated that this was a very disturbing and difficult case for him as well as it was for counsel because of the nature of the allegations of the case. It was a very lengthy trial. We had multiple witnesses. And when the court, one of the difficult things that was discussed when we were talking about in closing arguments was the fact that if Judge Blockman awarded custody to my client, he in fact would have been taking the child away from a primary caretaker. And I think that's always a tough decision in a case. But this case warranted that decision. And I know, judges, that you have probably reviewed some of the transcript, obviously not all of it, because as counsel indicated, it was around 1,800 pages. And when I tried to summarize some of the important parts that were left out of counsel's brief, because it was so lengthy, I tried to summarize the important parts that I thought were pertinent in a decision that you might make in this case. I think if we really look at the issues in this case, and I think that counsel places a lot of emphasis on the evidence that came in that related to emails that my client had sent to his client, basically back in the early part of their marriage. He relied upon exhibits. We saw exhibit after exhibit of things that were excerpts from when he had written a journal. The journal that he referred to was written when he was a young teenager, still exploring things. And as a result, he matured, and now he's in his 40s. I think my client was very forthcoming, and I think that both Dr. Appleton and the judge saw that when he did admit he had had some mental health issues previously and had sought treatment for those mental health issues. And I thought when Judge Blackman and I argued in my closing argument that all of the issues and all of the problems that Ms. Cassina thought my client had were all my client's fault. She acknowledged no culpability or anything that she may or may not have done to contribute to the demise of their marriage. What I really wanted to focus on today was the sexual abuse allegations of my client. It's very disturbing to my client. He went through practically a year, and I think the court can look in here, a significant period of time where he did not see his child because of the sexual abuse allegations. And from the beginning of this case, the original custody case was heard in Canada and was subsequently transferred here to Champaign County because that's where the parties had lived. And Ms. Cassina had been in Canada and had been separated from Mr. Cassina since 2010. And why I think that date is important is because that was the date that she really had had no contact with Mr. Cassina except for the brief periods of time that he would travel to Canada to see their daughter. So therefore, and I think I had her admit on the stand that she had no knowledge of any mental health issues or any issues that he had since 2010 when she had or they had attempted reconciliation. And I think that was noted in Dr. Appleton's report. There were psychological tests that were taken, and Dr. Appleton found no mental health issues that would affect his ability to parent Sophia. And I think that's important. Dr. Appleton reviewed so much information before arriving at her opinion that Mr. Cassina should have custody of Sophia. And I think the disturbing part from Judge Glassman was the amount of evidence that supported the alienation and the shared delusion that Ms. Cassina had with Sophia. And if we look back, even in Canada when she was litigating this case, she thought that Mr. Cassina should have supervised visitation. She had that same opinion when Dr. Hershberg, which Dr. Appleton reviewed his report in her opinion. Even after Dr. Hershberg said that he saw no endangerment and that Mr. Cassina should have unsupervised contact with the minor child Sophia, she still advocated for her position that Mr. Cassina should have supervised visitation. And in January of 2014, we had the first allegation of sexual abuse, which was in Canada. And after that issue of sexual abuse, nothing was done about that in Canada. And we had the move back to Champaign in Champaign-Urbana area in August of 2014. Not soon after that move, we had our first abuse allegation. And that was in September 18th of 2014. The allegation was that my client had inappropriately touched Sophia's vagina when she had been in the bathroom. And Ms. Cassina called 911. We had two police officers who responded to that call, and both of them had concerns regarding her mental health at that time. We had Officer McNutt, who basically said that Ms. Cassina emotionally had anxiety, that she really was going from thought to thought process and really was difficult to understand. She herself, during that interview, indicated to one of the officers that she had some mental health problems and needed to seek some treatment for that. One that was really disturbing to one of the officers was the tape that she had made, which was approximately three and a half minutes long. And it was a tape wherein she had been questioning her daughter and basically telling her daughter what to say. There were several concerns on that tape, and those were as follows, that she had done the questioning and she had been the first to have her daughter tell her story after some prompting. And even the officer admitted that the first person who should interview a child regarding sexual abuse should be a forensic interviewer and not a parent or someone who is not qualified to interview a child by sexual abuse. The DCFS was called on my client on that incident because the police are mandated reporters, and the child was interviewed by the CSAC. And in that interview, the minor child did not disclose any abuse allegations. There were testimony by then, my client, that he began to receive multiple texts and at this time he did not have overnight visitation or did not exercise the overnight visitation after that sexual abuse allegations. Continued text messages about do not touching her vagina, that he should not be telling Sophia to hurt herself, stop punching her in the stomach, and those text messages went on and on about different things that he should not do and blaming him for things that were really, to be honest with you, preposterous. After that incident of the sexual abuse, we then went to a petition to restrict his visitation. Another indicia of her wanting to restrict my client's relationship with the minor child, and continued alienation in support of the shared delusion that she had with her daughter, that her daughter had been sexually abused. And that we heard back in November of 2014. The basis of that petition was the sexual abuse allegation that occurred in September of 2014. And also we first heard about Mr. Gesina's alleged sexual abuse tendencies that we heard, the same that we heard during the trial. Judge Blackman at that time entered a finding that there was no sexual abuse. Then in December of 2014, Mr. Gesina takes Sophia to the emergency room and makes allegations of physical abuse now by my client. Once again, the next step in the alienation. And again, supporting her delusion that Sophia has been physically abused and harmed. Dr. Butteau interviewed the child at that time, and there were no found allegations of sexual abuse at that time, but physical abuse by Dr. Butteau. At that time, Dr. Butteau expressed later in her testimony that she had concerns during that interview regarding Ms. Gesina. She was anxious. She flighted from one part of the conversation to the next. She was incoherent. And Dr. Butteau elected not to interview her again on the second sexual abuse allegation. She could see, Dr. Butteau, even how she could be misunderstood and even her allegations dismissed. After that December incident, we now have in January the most severe sexual abuse allegation by Sophie. And that is that her father has taken her to a public place, which is his office, and has shut the door there and has made her take off her clothes, touched her in the vagina, and then has taken down his pants and asked her to touch his penis. Thereafter, that incident in January, Dr. Butteau, once again, she's taken to the emergency room and referred to Dr. Butteau. And at that time, Dr. Butteau finds that Sophie has been sexually abused. And the Department of Children and Family Services is called, and the child has been removed from her care, and an immediate petition is filed, and my client agrees to have no contact with Sophie until these allegations can be resolved. Not only has he not had contact with Sophie, but he is not allowed to have contact with his fiancée and their daughter, unless it's supervised, and is not able to reside with him in their house. At the hearing, and looking at the evidence that Dr. Ableton relied upon in her finding that Sophie was not abused by Mr. Gesina, she looked at Dr. Butteau's report, and in that report, when I had examined her at the prior hearing in January, she basically said that in any child abuse investigation, it's a multidisciplinary investigation, wherein you involve the police, you have the CAC interviews, you have psychologists, and when I asked her if any of those would be relevant, or would change her position that Sophie had been abused, she said no. When I asked her if it would be appropriate for her to look at the police reports in this case, she said no. When I asked her if it would be appropriate for her to review Dr. Hershberger's evaluation, she said no. When I asked her if it would be appropriate to talk to the child's counselor, she said no. And basically she said the only thing that would change my position was if Sophia was not in the foreign language building. She interviewed Sophia and did not take her, which was one of the criticisms of Dr. Osgood. Let me ask you. Dr. Butteau is an experienced examiner. She is. But there's no indicia, physical indicia, of abuse. Of sexual abuse. Right. And I think one of the scary things, and why this case is a difficult case and disturbing case, is because there is a sexual abuse allegation. And in Dr. Appleton's report, she admitted that we will never know 100% if the minor child was abused by Mr. Cassina. So Dr. Butteau would be basing her findings on the fact that as a pediatrician, she believed what the girl was telling her. That's correct. Not that there was any other objective proof. That's right. And that's what she said, basically. And her whole opinion was based on what Sophia told her. And so if it's a shared delusion, then that is not an appropriate, she's delusional with her mother. And so that would affect her credibility, Sophia's credibility. The idea being that each of them believe they're telling the truth. Right. And Sophie does believe she's telling the truth, because she's been alienated from her father and has now this shared delusion. And, I mean, with Dr. Appleton's report, we had tapes. We already heard about one of the tapes that the officer looked at, and those were very disturbing. And Dr. Appleton explains why those tapes were so prominent. And seeing the tapes really was an objective. We could actually see how she was alienated from her, and Dr. Appleton talked about the tapes and how those affected her opinion. We had Dr. Appleton talk about how Sophie had brought in visual aids. She had a, I think I can't even remember, some family of an animal, I can't remember which animal now, showing her how her dad had abused her. She had pictures that she brought in. And the way she reacted to her father when she had not seen him for several months was inconsistent with someone who had been abused by their father. Her demeanor changed from loving and caring with her father when she saw her mother in the waiting room. That was a factor she looked at. The fact that Mr. Cassino was willing to take a lie detector test came into the police report she relied upon. The fact that he had gotten treatment and there had been no mental health issues that she was aware of since 2010. The fact that he was willing to continue to go to counseling. We had the investigator of the criminal case who she relied upon where the investigator asked Sophia, well how do you remember all these things? And she said, well my mommy plays the doctor and I'm the child and we pretend and practice these things. We had where my client's picture had been taken of his penis and they did a visual examination and Sophie picked the boy's penis which was unusual. If you had been abused you would remember what that penis had looked like. We had the recordings.  who indicated that she suffered from anxiety. She was sometimes incoherent. She went back and forth to different episodes and basically said she was concerned if this anxiety continued that it would affect her ability to parent Sophie. Let me ask you another question. Apparently the e-mails between the parents came in to evidence or some of them. Some of them did, yes. In those e-mails did your client say things that might cause a parent to have concern? Well there were various e-mails. Well he suggests things about I'm afraid or those things from his diary that I might sexualize my students or I might think about I might sexualize my daughter or I've got these thoughts or these issues. Were those in the e-mails or were they in the journals? Judge, the journals were so vast. There were so many different things in these journals. Okay, let's forget the journals. The e-mails that went back and forth between your client and the mother, what did they disclose or suggest about what your client was saying? I'm going to be up front with you. Some of the e-mails would cause some disturbance. Even if he said and believed, which I think he was believed, that he did those to try and do what she said. Some of them were just disturbing. I'm going to be up front in that. But does he say you have to say this? No. But rather sort of you know you have problems, tell me about them. And if you don't talk about them and confess them, we're not going to get anywhere. I think the best description of their relationship, which was Dr. Hirshberger's report, and in his report he and Judge Blackman found that they had a toxic relationship. And they both abused each other. That would be in terms of verbal abuse and demeaning each other? I think my client, I'll be the first person to say this, I think Dr. Appleton said this as well, that he did have mental health issues. He was never diagnosed with a personality disorder. Did he say things that would cause some concern? Yes. But I think Dr. Appleton, and he was up front with Dr. Appleton about those. She had the e-mails that were referred to. And so while concerning, I think based on all of the other evidence and the fact that psychological examinations were taken, the fact that he sought treatment, the fact that he was up front with her, he signed all the releases to talk to any of his counselors, past, now, even five years ago, whatever. I think the fact that he did all of that made her comfortable. And I know he didn't see one of the respondents, counsel said, that kept saying, we haven't reviewed all these e-mails. But she did review extensive e-mails. And she talked to Ms. Gacina. So Ms. Gacina told all of this. She had e-mails. She did psychological testing. And so I think her concern was there was nothing as of today that concerned his ability to parent the child. And I think she said, when you look at what she said, if George had not been awarded custody, she said her concern is that if George does not have custody, there will be additional DCFS reports. And in order to keep his family, he will have to make a choice. She testified her concern that Sophie will grow up not having a sense of safety, sense of security, believing she's an abused parent, believing her father is an abuser, and a horrible person. And I think that, to me, says everything. And I know it was very difficult for the court to take custody away from a primary caretaker. But my client has a good relationship with her. I think Dr. Appleton talked about the bond. Obviously, Ms. Gacina's bond is stronger than my client's bond. But I think there's overwhelming evidence that there is a shared delusion and that my client should be awarded custody or the court should affirm the trial court's award of custody to him. Thank you, counsel. Thank you. Honorable. I think that if you look at the history of emails between the parties during this time period, they would be deeply concerning not only to the respondent but to any evaluator in this case. And contrary to what opposing counsel said, Dr. Appleton admitted she didn't look at a lot of these emails. She said during her testimony that the respondent sent her a flash drive that contained a lot of these materials and she couldn't open it. She wasn't aware of a lot of those emails. And if you look at those emails, those communications, it's all Mr. Gacina repeatedly talking about his borderline personality disorder, about his depression, about his anxiety, about his abusiveness. He even prepared a responsible partner plan where he talks about steps he was going to take to address his abusiveness and talking about his treatment. And what did your client say back? Pardon me? What did your client say back? Were the emails replied to? Correct. Yeah. These were all emails saying... And what did she say? She said, I want you to get the treatment that you need to be able to participate in your daughter's life. And it's important to note that he had remedies, but he went, between the time he obtained custody in July of 2013, he'd only had perhaps about five overnight visitations with his child in the five years prior to this time period. And these were all basically of his own choice. They had custody proceedings that were going on in Canada. He would go up there and be allowed to see the child, but it wasn't until he suddenly realized, oh, I'm going to start custody proceedings in Champaign County, that all this communication stopped. You seem to be arguing that Dr. Appleton's report shouldn't be worth as much as it might appear otherwise, because this material that was submitted to her wasn't considered by her. Is that correct? Correct. I think there are a lot of things that... Yes will suffice. Yes, that's correct. Okay. Was that material presented to Judge Blockman at the hearing? Yes. All of the emails and communications were exhibits that were offered into evidence. Did Dr. Appleton testify at the hearing? She did testify, yes. Did you ask her when she testified about this material that you say she needed to consider and did not? Yes, we cross-examined her on those. And what did she say about it? She said she wasn't provided with it and it didn't enter into her opinion. Now, except for response exhibits one and two, she did say that those would cause concerns to her about sexually deviant thoughts by the petitioner. So she did say that that would be something that would cause her concern. Did you argue to Judge Blockman, this argument you're now making to us, that Dr. Appleton's opinion is diminished in value because of her failure to consider these matters? Correct. I don't think it was... What did Judge Blockman say in response? He basically found that Dr. Appleton's report was a factor, was a non-statutory factor. He went down the whole list of the statutory factors and then that was one of the non-statutory factors that he considered. But I think a good indication that Judge Blockman's decision was against the manifest way of the evidence, if you look at the 602 factors, is that he basically gave no weight whatsoever to the respective wishes of the parties, which is one of the statutory factors the trial court has to consider. It was significant to note that we were basically halfway through the custody hearing where Mr. Gesina testified that it was his request that the conclusion of the hearing that this child be placed in foster care with DCFS. And yet Judge Blockman found that the wishes of the parents in this case were awash. And so it was only after we had a recess and Mr. Gesina had a conference with his attorney, he came back and said, well, I didn't realize that my child couldn't be placed with DCFS. So up to the commencement of the proceeding, even a good portion of the way through the proceeding, it was his wishes not that he be awarded sole custody like my client wanted. It was his wishes that the child be placed with DCFS. What's the significance of that? Well, because the wishes of the parent is one of the statutory factors. And I think if the trial court concluded that the wishes of the parents was awash in this case, it didn't favor either one. So you're arguing that he didn't want to really be the custodial parent? No, he did. He wanted the child to be placed. So the answer is yes? That's correct, yes. And did Judge Blockman address that? He did. He said the wishes of the parents were awash. He didn't give that any weight whatsoever. He didn't give any weight to the fact that prior to this, Mr. Gesina had taken steps, once Dr. Appleton's report came out, to hand that over to DCFS to start a juvenile case to have the child removed from my client and placed in foster care for a period of time. Well, counsel, as you indicated, and of course the record speaks for itself, when the petitioner indicated that about DCFS, the child being placed with DCFS, as you indicated, there was a recess and Judge Blockman expressed his concern about that and then went on after that to say that he basically felt that the petitioner was in a situation where he was just trying to preserve his existing family and not be subjected to harassment and repeated allegations of sexual abuse and physical abuse. And so he was looking to that as more of a transition period and that, you know, Judge Blockman was very clear with him that's not an option. And then the petitioner indicated, okay, now that I understand that, yes, I do want my child placed with me. Is that accurate? I think he was less than equivocal once we even came back from the recess. I think he said he was still not completely satisfied that his child should be with him initially. And so whether or not he's prepared at that point to have his child with him, that goes to the wishes of the parties. And, again, that's a statutory factor the court completely overlooked in this case regardless of the rest of the evidence. So, Your Honors, we would ask that this court reverse the ruling of the trial court and remand this case for further proceedings. Thank you, counsel. We'll take this matter under advisement and await the readiness of the next case.